# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Kathryn O'Keefe, et al.,                           Case No. 0:24-cv-00076-NEB-DLM

             Plaintiffs,

                                           **DEFENDANT WELLS FARGO BANK,**
v.                                                 **N.A.'S MEMORANDUM OF LAW IN**
                                           **SUPPORT OF ITS MOTION TO**
Wells Fargo Bank, N.A., et al.,                    **DISMISS THE FIRST AMENDED**
                                               **COMPLAINT**

             Defendants.

## INTRODUCTION

In their First Amended Complaint ("FAC"), Plaintiffs Kathryn and Timothy O'Keefe allege a scammer posing as an employee of the "Geek Squad" contacted Mr. O'Keefe and obtained from him sufficient information for the scammer to gain online access to the O'Keefes' Wells Fargo account. Thus enabled to act online as the O'Keefes, the scammer advanced $100,000 from their home equity line of credit ("HELOC") with Wells Fargo into their Wells Fargo checking account. The scammer next told Mr. O'Keefe that the Geek Squad had mistakenly put the $100,000 into the checking account and that Mr. O'Keefe would have to pay the money back to the Geek Squad by making a wire transfer of $98,000 to a Mr. Au Don Saileuang at a bank in Bangkok, Thailand. The scammer told Mr. O'Keefe to keep the remaining $2,000 of the Geek Squad's money as a "refund." Mr. O'Keefe went to a Wells Fargo branch that same day and ordered the $98,000 wire transfer. Later, the O'Keefes and their son contacted Wells Fargo in an attempt to undo the wire transfer. Wells Fargo was unable to recover the money.

Subsequently, Wells Fargo has allegedly reported the HELOC charge on the O'Keefes' credit reports.

Pursuant to Uniform Commercial Code ("UCC") Article 4A, Minn. Stat. § 336.4A-101 *et seq.*, the O'Keefes are liable for the wire transfer—which caused them to lose the $98,000—because Mr. O'Keefe authorized it. *See* Minn. Stat. § 336.4A-202(a). Under the UCC, a customer who is the victim of third-party fraud cannot shift his loss onto a bank that faithfully executes the customer's wire instructions. *See, e.g., Harborview Capital Partners, LLC v. Cross River Bank*, 600 F. Supp. 3d 485, 494 (D.N.J. 2022) (UCC 4A-202(a) "applies where, as here, the customer actually does authorize a transfer . . . even if it turns out that the customer ordered the transfer only because it had been defrauded by some third party.").

Realizing this fact, the O'Keefes disregard the UCC and plead five Counts against Wells Fargo invoking other statutes and the common-law doctrine of unjust enrichment. Their theory is that, despite the UCC and despite the fact that Mr. O'Keefe intentionally wire transferred the $98,000 to the fraudster, they nevertheless can leave Wells Fargo with the loss because, supposedly, it was proximately caused by Wells Fargo's alleged violations of those other statutes and unjust enrichment. Their creative theories to shift their self-inflicted loss onto Wells Fargo need not be tested here, however, because they fail to state a claim for unjust enrichment or for violation of the other statutes. Taking their five Counts in order:

First, the O'Keefes' unjust enrichment claim fails because their relationship with Wells Fargo is governed by a written contract. Indeed, the only "unjust enrichment"

Plaintiffs allege is the principal and interest Wells Fargo demands under the HELOC contract. Second, the O'Keefes cannot recover under the Electronic Fund Transfer Act ("EFTA") because the EFTA does not apply to the unauthorized $100,000 HELOC advance into their checking account. The EFTA applies only to unauthorized transfers *from* an account, not *to* an account. Third, the O'Keefes cannot state a claim under the Fair Credit Billing Act ("FCBA") because the HELOC charge was not a "billing error" under the FCBA. To the contrary, the billing statement the O'Keefes received from Wells Fargo accurately reflected the $100,000 advance.   Fourth, the O'Keefes' FCRA claim fails because 15 U.S.C. § 1681s-2(b) did not require Wells Fargo to flag the HELOC advance as "disputed" in Wells Fargo's credit reporting.  Further, to the extent the O'Keefes allege violations of 15 U.S.C. § 1681s-2(a)(3) or (a)(6)(B), there is no private right of action for such violations. Fifth, the O'Keefes' claim for punitive damages under Minn. Stat. § 549.20 fails because: (a) their four substantive claims all fail on the merits; (b) even if these four claims were meritorious, they would not support an award of punitive damages under Minn. Stat. § 549.20; and (c) the FAC fails to allege sufficient facts to support a clear and convincing inference Wells Fargo acted willfully.  For all these reasons, the Court should dismiss the FAC in full.

## FACTS

The facts alleged in the FAC or included within documents referenced or relied upon by the FAC are as follows.  On January 18, 2023, a scammer posing as the Geek Squad convinced Mr. O'Keefe to divulge information that allowed the scammer to remotely access the O'Keefes' computer and banking information.  ECF No. 25 ¶¶ 65-70. The

scammer used the information to advance $100,000 from the O'Keefes' Wells Fargo HELOC into their Wells Fargo checking account. *Id.* ¶ 71. The scammer then told Mr. O'Keefe that the Geek Squad had accidentally made a deposit of $100,000 to Plaintiffs' checking account and that Mr. O'Keefe would need to send $98,000 of the $100,000 back by wire transfer. The scammer told Mr. O'Keefe he could keep the remaining $2,000 of the Geek Squad's money as a "refund." *Id.* ¶¶ 83-86; police report annexed as Exhibit 1 to Declaration of Shayne Driscoll ("Driscoll Declaration"). Later that same day, Mr. O'Keefe went to a Wells Fargo branch and ordered a wire-transfer of $98,000 to a Mr. Au Don Saileuang at an account in Bangkok, Thailand. ECF No. 25 ¶ 87; wire transfer order annexed to the Driscoll Declaration as Exhibit 2. Wells Fargo executed Mr. O'Keefe's payment order that same day. Exhibit 3 to the Driscoll Declaration. Two days later, the O'Keefes complained to Wells Fargo, but Wells Fargo was unable to recover their money. ECF No. 25 ¶¶ 97-140. At all relevant times, the O'Keefes' HELOC and checking account were governed by the HELOC agreement and account agreement attached as Exhibits 4 and 5 to the Driscoll Declaration.[1]

---

[1] Because the FAC references and relies upon the wire transfer documentation and police report, it is appropriate for the Court to consider them on this motion to dismiss. *See Enervations, Inc. v. 3M*, 380 F.3d 1066, 1069 (8th Cir. 2004) ("[D]ocuments necessarily embraced by the complaint are not matters outside the pleading.") (quotation marks and citations omitted). The Court may also consider the parties' HELOC agreement and account agreement because, as explained below, these contracts preclude the O'Keefes' unjust enrichment claim. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (court may consider contract documents that refute a "claim that defendant breached a statutory or common law duty" even if documents are not attached to complaint) (citations omitted).

The O'Keefes allege that Wells Fargo thereafter reported the HELOC charge to the three major credit reporting agencies: Experian Information Solutions, Inc., Equifax Information Services LLC, and TransUnion LLC (the "CRAs" and together with Wells Fargo, "Defendants"). *Id*. ¶ 161. The O'Keefes allege they disputed the relevant trade lines with the CRAs in May 2023 and again in August 2023, but Defendants continued reporting the HELOC charge. *Id*. ¶¶ 162-374.

Based on these allegations, the O'Keefes bring claims for unjust enrichment and violations of the EFTA, FCBA, and FCRA, and for an award of punitive damages under Minn. Stat. § 549.20. Wells Fargo now moves to dismiss these claims in their entirety.

## LEGAL STANDARD

Fed. R. Civ. P. 12(b)(6) permits a defendant to move to dismiss for "failure to state a claim upon which relief can be granted[.]" To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## ARGUMENT

**I.     The Court should dismiss Plaintiffs' unjust enrichment claim because it is based on the parties' written contract.**

Count One of the FAC purports to assert a claim for unjust enrichment. It alleges Wells Fargo received two types of "enrichment:" (1) the "$100,000 debt on Plaintiffs'

HELOC owed to Wells Fargo;" and (2) the interest payments that "Plaintiffs have paid Wells Fargo every month for the debt on the HELOC." (ECF No. 25 ¶¶ 510, 515.)

"Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). However, the doctrine "does not apply when there is an enforceable contract that is applicable." *Id*. Indeed, the Minnesota Supreme Court has repeatedly "limited the application of unjust enrichment to claims premised on an implied or quasi-contract between the claimant and the party alleged to be unjustly enriched." *Id*. (collecting cases).

Here, the alleged unjust enrichment is nothing other than contractual rights to repayment of principal and interest that Wells Fargo asserts under the HELOC contract. (ECF No. 25 ¶¶ 510, 515.) Plaintiffs assert Wells Fargo is "unjust" to collect repayment under the HELOC, but such an assertion is the stuff of a claim for breach of contract, not unjust enrichment. The relationship between Plaintiffs and Wells Fargo concerning the HELOC charges is governed by the express HELOC contract, not by implied or quasi contracts. Plaintiffs, therefore, cannot state a claim for unjust enrichment, and the Court should dismiss Count One with prejudice.

## II.    The Court should dismiss Plaintiffs' EFTA claim because the EFTA does not apply to any of the financial transactions at issue.

Count Two of the FAC claims Wells Fargo violated the EFTA, 15 U.S.C. § 1693 *et seq.*, and its implementing Regulation E, 12 C.F.R. § 1005.1 *et seq.* The EFTA is a federal statute governing "electronic fund transfers," as defined in 15 U.S.C. § 1693a(7).

Relevant here, the EFTA contains provisions governing a bank's responsibilities when a consumer reports an "error" related to an electronic fund transfer. *See* 15 U.S.C. § 1693f. Plaintiffs claim Wells Fargo violated § 1693f because, they allege, they reported an error and Wells Fargo failed to perform its statutory responsibilities. The alleged error is Wells Fargo's credit of the $100,000 advance on their HELOC to their checking account.[2] (FAC ¶¶ 466, 523-530.)

Wells Fargo is entitled to dismissal of Plaintiffs' EFTA claim because the error they allege is not among the "errors" statutorily defined and covered by the EFTA. The error they allege is an unauthorized transfer to their checking account. The EFTA does not cover unauthorized transfers *to* a consumer's account. Instead, the EFTA covers unauthorized transfers only when they are *from* a consumer's account.

The relevant EFTA provision is 15 U.S.C. § 1693f(f), defining the acts that constitute "error." Two of those acts are important here: (1) "an unauthorized electronic fund transfer;" and (2) "an incorrect electronic fund transfer from or to the consumer's account." *Id.*

---

[2] Plaintiffs allege three financial transactions involving Wells Fargo: (1) the $100,000 advance from their HELOC; (2) the credit of the $100,000 to their checking account; and (3) the $98,000 wire transfer. Plaintiffs agree that the EFTA does not apply to the first and third of those transactions. *See* Meet and Confer Statement dated February 23, 2024, signed by Plaintiffs' attorney, attached as Exhibit 7 to the Driscoll Declaration (also Dkt. 24 hereof). The EFTA does not cover the advance from the HELOC because a HELOC is an open-end credit plan and therefore not an "account" subject to the EFTA. *See* 15 U.S.C. § 1693a(2); *Shames-Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994, 1006-07 (N.D. Ill. 2009) (plaintiffs' HELOC was open end credit plan "explicitly exempted from coverage of the EFTA"); *see also* 15 U.S.C. § 1602(j) (defining "open-end credit plan"). Wire transfers such as occurred here are specifically excepted from the EFTA. *See* 15 U.S.C. § 1693a(7).

An "unauthorized electronic fund transfer" within EFTA's coverage cannot be *to* a consumer's account. It can only be *from* a consumer's account. This is because the EFTA's definition of "unauthorized electronic fund transfer" covers only transfers "from" the consumer's account:

> the term "unauthorized electronic fund transfer" means an electronic fund transfer *from* a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit …

15 U.S.C. § 1693a(12) (emphasis added).

By comparison, an "incorrect" electronic fund transfer can be "from or to" the consumer's account. 15 U.S.C. § 1693f(f)(2).

Thus, the EFTA does not cover the $100,000 credit to Plaintiffs' checking account if it was "unauthorized." It covers the credit only if it was "incorrect." Pursuant to the canons of statutory interpretation, an "incorrect" electronic fund transfer is a creature different and distinct from an "unauthorized" fund transfer. Section 1693f itself makes this point clear by providing separately for "unauthorized" electronic fund transfers and for "incorrect" electronic fund transfers:

> For the purpose of this section, an error consists of—
>
> (1) an unauthorized electronic fund transfer;
>
> (2) an incorrect electronic fund transfer from or to the consumer's account;
>
> …

15 U.S.C. § 1693f(f)(1) and (2). If the two concepts were the same, or if one included the other, there would be no need for the separate provisions. It is axiomatic, however, that a

8

statute must be construed so that none of its parts is mere surplusage. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: INTERPRETATION OF LEGAL TEXTS 175 (1st ed. 2012) (The surplusage canon prevents "an interpretation that renders [a statutory provision] pointless."); *see also Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 478 (2017) ("Our practice . . . is to give effect, if possible, to every clause and word of a statute.").

Thus, an "incorrect" electronic fund transfer is not an "unauthorized" fund transfer, and *vice versa*. Instead, an "incorrect" electronic fund transfer within the meaning of § 1693f(f)(2) is one "sent in an 'incorrect' amount or to an 'incorrect' recipient." *Sanchez v. Navy Fed. Credit Union*, No. EDCV 23-285 JGB (KKx), 2023 U.S. Dist. LEXIS 142817, at *80-83 (C.D. Cal. Aug. 14, 2023).

There is nothing in Plaintiffs' complaint that indicates any "incorrect" transfer. Instead, Plaintiffs allege facts showing that the advance from their HELOC to their checking account was "unauthorized." Specifically, the FAC alleges countless times, both expressly and by implication, that the charge against the HELOC was "unauthorized." *See, e.g.,* FAC ¶¶ 71-74, 76-77; *see also id.* ¶ 82 ("Plaintiffs were not even aware that the . . . $100,000 transfer to their Checking Account happened"); ¶ 139 ("… Plaintiffs did not transfer $100,000 from their HELOC to their Checking Account on January 18, 2023, the Thieves did."). Indeed, if the transfer from the HELOC to the checking account was *not* unauthorized, Plaintiffs would have no basis for any of their claims against Wells Fargo.

In their original complaint, Plaintiffs alleged the deposit of the $100,000 in HELOC proceeds into their checking account was an "error" under the EFTA because it was an

"unauthorized electronic fund transfer" under 15 U.S.C. §§ 1693a(12) & 1693f(f)(1).  ECF No. 1-1 ¶¶ 76 & 448.  Wells Fargo moved to dismiss the EFTA claim because an "error" under § 1693f(f) cannot be an unauthorized fund transfer *to* an account. Now, in their FAC, Plaintiffs attempt to paper over this fatal defect in their claim by simply relabeling the transfer as an "incorrect transfer" which, pursuant to § 1693f(f)(2), can be made "from or to" the consumer's account. *See, e.g.,* FAC ¶¶ 71, 75, 117, 462.

But the mere fact the FAC relabels the deposit an "incorrect electronic fund transfer" does not make it so.  It is a mere legal conclusion which is not presumed correct for purposes of a motion to dismiss.  *See McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015) (court need not accept "legal conclusions couched as factual allegations") (citation omitted). Plaintiffs' burden was to plead facts from which an "incorrect" transfer could be found, and they failed to do so.

In summary, when an EFTA plaintiff alleges he did not authorize an electronic funds transfer, he has not alleged an "incorrect electronic funds transfer" under § 1693f(f)(2). Further, where the plaintiff alleges the transfer was made into the plaintiff's account, rather than out of the account, the plaintiff has not alleged an "unauthorized electronic funds transfer" under 15 U.S.C. §§ 1693a(12) & 1693f(f)(1).

Here, because Plaintiffs allege facts demonstrating that the deposit of the HELOC proceeds into their checking account was unauthorized—and not that the deposit reflected an incorrect amount or recipient—Plaintiffs have not alleged an "incorrect" electronic funds transfer.  Further, because they allege a transfer *into* their checking account rather than a transfer *from* the checking account, they have not alleged an "unauthorized"

electronic funds transfer.  Accordingly, Plaintiffs fail to allege an "error" under the EFTA, and the EFTA claim should be dismissed with prejudice.

**III.     The Court should dismiss Plaintiffs' FCBA claim in full because the HELOC charge was not a "billing error" under 15 U.S.C. § 1666(b)(1).**

In Count Three of the FAC, Plaintiffs allege Wells Fargo violated the FCBA, 15 U.S.C. § 1666, and its implementing regulation, 12 C.F.R. § 1026.13. ECF No. 25 ¶¶ 532-34. The FCBA provides that when obligors (here, Plaintiffs) give their creditor (here, Wells Fargo) a timely written notice setting forth their belief that the creditor's statement of the obligor's credit account contains a "billing error" *and* the reasons for their belief, the creditor must comply with certain obligations.  *See* 15 U.S.C. § 1666(a)(2) and (3). Here, Plaintiffs' written notice (the "Dispute Letter") allegedly disputed Wells Fargo's charge for the $100,000 draw on the HELOC, giving as reason their assertion they did not authorize the draw. *See* FAC ¶¶ 131-135; a copy of the Dispute Letter is annexed to the Driscoll Declaration as Exhibit 6.

Plaintiffs' FCBA claim fails because the error they allege in their Dispute Letter is not a "billing error" within the meaning of the FCBA. The FCBA defines "billing error" as any of the following seven possible issues with a creditor's billing statement to the obligor:

> (1)     A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

> (2)     A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

(3)    A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.

(4)    The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.

(5)    A computation error or similar error of an accounting nature of the creditor on a statement.

(6)    Failure to transmit the statement required under section 1637(b) of this title to the last address of the obligor which has been disclosed to the creditor, unless that address was furnished less than twenty days before the end of the billing cycle for which the statement is required.

(7)    Any other error described in regulations of the Bureau.

15 U.S.C. § 1666(b).

Of these seven possible billing errors, Plaintiffs allege only the first; i.e., (b)(1):

Specifically, the unauthorized charge of $100,000 against the HELOC was "an extension of credit not made to the obligor or, if made, was not the amount reflected on such statement." 15 U.S.C. § 1666(b)(1).

FAC ¶ 74 (citation to FCBA in original).[3]

The plain language of (b)(1), however, makes clear it does not apply to the situation at hand. Subsection (b)(1) applies when the extension of credit is *not* made to the obligor. Here, as Plaintiffs acknowledge, the $100,000 was advanced directly into the obligors' (i.e., the O'Keefes') account. Thus, (b)(1) does not apply here.

It is perfectly reasonable for Congress to have drawn the line at the point of protecting those who did not receive the billed-for extension of credit, but not going so far

---

[3] Notably, the second category of possible billing errors is inapplicable. Although 15 U.S.C. § 1666(b)(2) includes "[a] reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof," Plaintiffs' Dispute Letter did not request additional clarification.

as to protect those who received the billed-for extension of credit even if it was unauthorized. Those who actually receive the funds are in a position to repay them immediately and avoid harm. They will suffer loss only if they take a further step that is foolish or careless. Not so for those who never receive the funds in the first place.

Here, Wells Fargo put the money into Plaintiffs' checking account. Therefore, the HELOC charge was an extension of credit "to the obligor" and, pursuant to the plain language of § 1666(b)(1), not a billing error. *See id*.

In the FAC, Plaintiffs cite three purported authorities for their position that an extension of credit made directly to a consumer can be a "billing error" under 15 U.S.C. § 1666(b)(1). First, the FAC quotes *Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818, 827 (S.D. Tex. 2007), to argue § 1666(b)(1) encompasses "[a]n extension of credit that was either not made by the debtor or was not made in the amount reflected on the statement[.]" However, *Esquibel* has no precedential weight in this District and has no persuasive authority because it offers no reasoning for its quasi-legislative rewriting of the statute. Congress chose not to extend the reach of § 1666(b)(1) to unauthorized extensions of credit actually made to a consumer. The *Esquibel* court erred by going beyond the plain and reasonable meaning of Congress' chosen language.

The FAC also quotes a December 1993 document prepared by the Federal Trade Commission ("FTC") which states that 15 U.S.C. § 1666(b) encompasses "[c]harges not made by you or anyone authorized to use your account." ECF No. 25 ¶ 76 (citation to FTC source contained therein).) However, the cited document is a mere guidance document prepared for consumers. Such documents are not binding on a court, a regulated person,

or even the agency that issued them. *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662-63 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference" and are "entitled to respect . . . only to the extent that those interpretations have the power to persuade") (citations and quotation marks omitted). Instead, the FTC's relevant statement on the meaning of 15 U.S.C. 1666(b) is its regulation defining "billing error," and the FTC's regulatory definition does not include the language from the December 1993 document or anything like it. *See* 12 C.F.R. § 226.13. Thus, the guidance document is inapposite.

The FAC also cites a webpage maintained by Capital One, a credit card issuer that is not a party to this case, to argue that "[c]reditors" interpret § 1666(b) to apply to "unauthorized charges on a consumer's billing statement." ECF No. 25 ¶ 77. However, Capital One's interpretation of the law (if that is what the webpage is) does not constitute legal authority.

Plaintiffs' reliance on *Esquibel*, FTC "guidance," and Capital One advertisements is all the more misplaced because those citations do not apply to the Plaintiffs' fact pattern. Here, funds were advanced against their HELOC and placed in their checking account. Plaintiffs were the only parties in control of their checking account and could simply have sent the funds back to the HELOC. Instead, Mr. O'Keefe used them. The advance became effective and binding when Mr. O'Keefe took $98,000 of it and sent it to Bangkok. *See* Restatement (Second) of Contracts, § 69 ("An offeree who does any act inconsistent with

14

the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable."). Under the plain language of 15 U.S.C. § 1666(b)(1), Plaintiffs have failed to allege a "billing error" under the FCBA, and the Court should dismiss the FCBA claim with prejudice.

## IV.    The Court should dismiss the FCRA claim in full.

### 1.    Plaintiffs' claim under 15 U.S.C. § 1681s-2(b) fails because Wells Fargo had no duty to report Plaintiffs' dispute of their debt.

The FCRA places certain duties upon a person (here, Wells Fargo) that furnishes credit information to a CRA when the furnisher is informed by the CRA that the consumer disputes the "completeness or accuracy" of the relevant information. 15 U.S.C. § 1681s-2(b)(1). Among other things, the furnisher is charged under those circumstances to investigate the dispute, report the results of its investigation to the CRA, and correct the disputed information as needed. *See id.* § 1681s-2(b)(1)(A)-(E).

Here, Plaintiffs claim Wells Fargo violated § 1681s-2(b) in its handling of Plaintiffs' dispute of their HELOC debt. According to Plaintiffs, once Wells Fargo became aware of Plaintiffs' dispute, Wells Fargo was required under § 1681s-2(b) to either forgive the debt, not report the debt, or report that Plaintiffs disputed the debt. *See, e.g.,* ECF No. 25 ¶¶ 214-215.

Wells Fargo is entitled to dismissal of Plaintiffs' FCRA claim because a furnisher has no duty to report that a consumer disputes a debt on grounds that the consumer was tricked by a fraudster into taking the creditor's money and spending it. There is no true merit to a person's dispute of a debt when that person has already taken and spent the funds

at issue. Yet there would potentially be a signficiant downside to reporting the debt as disputed. If a furnisher were forced to acknowledge such an account as disputed, "the CRA would be unable to include the negative information in formulating the consumer's credit score." *Horton v. Trans Union, LLC*, 2015 U.S. Dist. LEXIS 29564, at *25 (E.D. Pa. Mar. 9, 2015). Thus, suppressing the tradeline or reporting Plaintiffs' dispute in these circumstances would not lead to a better-informed credit community.

Pursuant to recent authority in this District, "FCRA does not impose strict liability on furnishers who omit a consumer dispute." *Sherman v. Sheffield Fin. LLC*, 627 F. Supp.3d 1000, 1011 (D. Minn. 2022) (Tunheim, J.). "Instead, furnishers only have a duty to report (1) potentially meritorious or bona fide disputes that (2) could materially affect how one interprets the consumer's creditworthiness." *Id.* at 2012. Here, Plaintiffs fail both prongs of that test.

For a dispute to be "potentially meritorious or bona fide," it must, among other things, "suggest[] that a borrower is less financially irresponsible than the undisputed report tends to suggest." *Id.* at 1013. Here, Plaintiffs dispute their responsibility to repay Wells Fargo because they were tricked by a fraudster. *See, e.g.,* FAC ¶ 371 (alleging that Wells Fargo should have reported Plaintiffs' statement of dispute on the HELOC tradeline stating: "I dispute the balance on this account, I was the victim of fraud and I don't owe a debt to Wells Fargo on my HELOC.").

Plaintiffs' victimization at the hands of a fraudster, however, does not suggest they are less financially irresponsible than otherwise. Being defrauded does not suggest financial responsibility. Nor does Plaintiffs' denial of responsibility for the debt suggest

reduced financial irresponsibility when the asserted basis for the denial is that the debtor was tricked by a third party into spending the money. Rather, it suggests a misfortune with which most persons can sympathize, just like unexpected business troubles, loss of a job, and a host of other reasons for not paying a debt that a furnisher need not report. The touchstone, however, is not whether Plaintiffs are sympathetic, but whether their dispute suggests less financial irresponsibility on their part.

Moreover, Wells Fargo's report of Plaintiffs' debt does not suggest financial irresponsibility on Plaintiffs' part. As Plaintiffs acknowledge, they "have paid Wells Fargo every month for the debt on the HELOC, inclusive of payments for assessed interest." ECF No. 25 ¶ 515. It would be strange reasoning indeed to conclude that a tradeline showing Plaintiffs' responsible, timely repayment of the debt somehow indicates financial irresponsibility. Further, Plaintiffs acknowledge that Wells Fargo's report of the debt, which omitted Plaintiffs' dispute, did not affect their perfect credit score of 990 *at all*. ECF No. 25 ¶¶ 443-449. It is impossible to contend that Wells Fargo's report suggested financial irresponsibility on Plaintiffs' part, when Plaintiffs' credit score under Wells Fargo's report was the highest possible.

Because Wells Fargo's report did not create a suggestion of financial irresponsibility, and because Plaintiffs' dispute does not suggest they are less financially irresponsible, Plaintiffs' FCRA claim against Wells Fargo must be dismissed with prejudice.

Plaintiffs' FCRA claim also fails the second prong of the *Sherman* test; i.e., the requirement that omission of the the dispute "could materially affect how one interprets the

consumer's creditworthiness." *Id.* at 2012. As the Court explains, "in most cases, reporting an actual debt without noting that it is disputed is unlikely to be materially misleading." *Id.* at 1015. Exceptions exist, however, if: (a) the dispute could materially alter how the reported debt is understood; and (b) failing to report the dispute can be exspected to have an adverse effect:

> Although in most cases, "reporting an actual debt without noting that it is disputed is unlikely to be materially misleading," exceptions exist. Failing to report a dispute is materially misleading "where a dispute . . . could materially alter how the reported debt is understood." Thus, a report need not be "patently incorrect" to be misleading if the report omits the context necessary to evaluate the debt. In addition to being misleading, it must be material meaning that 'it can be expected to have an adverse effect."

*Id.*

Here, Wells Fargo's omission of Plaintiffs' dispute did not "omit[] the context necessary to evaluate the debt." *Id.* Victimization by a third-party fraudster does not relieve one of the obligation to repay the creditor whose funds the victim used to pay the fraudster. The allegedly missing context, therefore, was not material.

## 2.    There is no private right of action for alleged violations of 15 U.S.C. § 1681s-2(a)(3) or (a)(6)(B).

Plaintiffs' FCRA claim might also allege violations of 15 U.S.C. § 1681s-2(a)(3) and (a)(6)(B). *See* ECF No. 25 ¶¶ 492-93. Subsection (a)(3) provides: "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed *to such person* by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." 15 U.S.C. § 1681s-2(a)(3) (emphasis added). Thus, where a consumer disputes

a particular tradeline directly with the furnisher, *see generally id*. § 1681s-2(a)(8), the furnisher must note in its reporting that the tradeline is disputed. However, subsection (a)(3) does not apply here because Plaintiffs do not allege they disputed Wells Fargo's CRA reporting directly with Wells Fargo. Instead, Plaintiffs allegedly sent dispute letters to the CRAs. *See* ECF No. 25 ¶¶ 162-374.

Even if subsection (a)(3) applied here, the fact would remain that there is no private right of action for violations of this subsection. Subject to exceptions not applicable here, the FCRA's provisions creating a private right of action do not apply to violations of 15 U.S.C. § 1681s-2(a), including violations of subsection (a)(3). *See* 15 U.S.C. § 1681s-2(c)(1); *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012) (FCRA "plainly restricts" enforcement of § 1681s-2(a) "to federal and state authorities."). Therefore, Plaintiffs fail to state a claim under subsection (a)(3).

For the same reason, Plaintiffs cannot state a claim for any alleged violation of 15 U.S.C. § 1681s-2(a)(6)(B). In certain cases, subsection (a)(6)(B) prohibits a furnisher from reporting a tradeline which a consumer claims is the result of identity theft. There is relatively little case law discussing this provision, which Congress added to the FCRA in 2003. *See* 108 P.L. 159, 117 Stat. 1952, 1967. However, because subsection (a)(6)(B) is also part of 15 U.S.C. § 1681s-2(a), there is no private right of action for its violation. *See* 15 U.S.C. § 1681s-2(c)(1); *Leslie v. Wells Fargo Bank, N.A. Inc.*, No. 1:22-CV-03983-ELR-JEM, 2023 U.S. Dist. LEXIS 74508, at *20 (N.D. Ga. Apr. 27, 2023) (dismissing purported claim under subsection (a)(6)(B), noting that "as Wells Fargo correctly points out, only federal agencies, federal officials, and state officials can seek to enforce this

provision.") (quotation marks omitted). Therefore, the Court should dismiss any FCRA claim under § 1681s-2(a) with prejudice.

**V.    The Court should dismiss Plaintiffs' claim for punitive damages under Minn. Stat. § 549.20.**

**1.    Because all four of their substantive claims fail as a matter of law, Plaintiffs cannot recover punitive damages.**

For the reasons explained in Sections I through IV, above, Plaintiffs' four substantive claims for violations of the FCBA, EFTA, and FCRA and for unjust enrichment all fail as a matter of law.  Thus, none of these claims can support an award of punitive damages. Therefore, the Court should dismiss Plaintiffs' punitive damages claim with prejudice. *See United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 782 N.W.2d 263, 273 (Minn. App. 2010) ("A claim for punitive damages is not an independent claim.").

**2.    Even if Plaintiffs' substantive claims were meritorious, punitive damages would not be available under Minn. Stat. § 549.20.**

Even if any of Plaintiffs' four substantive claims were meritorious, those claims do not allow a punitive damage award under Minn. Stat. § 549.20.  First, "punitive damages claims under Minnesota law, by their very nature, rely on the existence of a state tort law claim." *Schedin v. Ortho-Mcneil-Janssen Pharm., Inc.*, 776 F. Supp. 2d 907, 915 (D. Minn. 2011). Plaintiffs assert no state tort law claim, and therefore they have no claim for punitive damages under Minnesota law.

Second, Plaintiffs' claim for state-law punitive damages under the FCRA is preempted. *See Odato v. JPMorgan Chase Bank, N.A.*, 2016 U.S. Dist. LEXIS 87637, at

*9 (E.D.N.Y. 2016) (state law claim for punitive damages against furnisher preempted by FCRA); *Grigoryan v. Bank of Am. Corp.*, 2012 U.S. Dist. LEXIS 189873, at *37-39 (C.D. Cal. 2012) ("Because [Plaintiff's] state law claims are preempted by the FCRA, the court need not consider his request for punitive damages under [California] Civil Code § 1785.31.").

Third, and similarly, punitive damages beyond those allowed in the EFTA itself, pursuant to 15 U.S.C. § 1693m, are not allowed. *See Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 998-99 (C.D. Cal. 2008) (striking a claim for general punitive damages for an EFTA violation because the EFTA sets forth its own standards for punitive damages); *Anderson v. Expressmart*, 2013 U.S. Dist. LEXIS 1365, at *1 n.1 (N.D. Ala. 2013) ("The EFTA also does not identify punitive damages as an item recoverable by either an individual plaintiff or a class."); *Garland v. Wal-Mart Stores, Inc.*, No. 1:09-cv-1067, 2009 U.S. Dist. LEXIS 90387, at *4 (W.D. Tenn. 2009) ("This Circuit recognizes the canon of construction expressio unius est exclusio alterius, meaning 'the expression of one thing implies the exclusion of another thing.' Because these remedies are not listed in the EFTA, and Plaintiff only claims relief under the EFTA, the Magistrate Judge is of the opinion that these portions of the prayer for relief have no relation to the controversy.") (citation omitted).

Fourth, the remedies for violation of the FCBA are prescribed by statute, and those remedies do not include damages beyond those set forth in the statute. *See* 15 U.S.C. § 1640(a)(2); *see also Williams v. Dee Miracle Auto Grp. LLC*, 2016 U.S. Dist. LEXIS 80922, at *14 n.6 (D. Md. 2016) ("Punitive damages are not available under TILA [which

includes the FCBA]. *See* 15 U.S.C. § 1640 (no statutory provision for punitive damages)");
*Pelayo v. Home Capital Funding*, 2009 U.S. Dist. LEXIS 44453, at *25 (S.D. Cal. 2009)
("TILA similarly prescribes its own remedies. The statute allows, inter alia, recovery for
actual damages, costs, and reasonable attorney's fees, but does not allow punitive damages.
See 15 U.S.C. § 1640(a) (2009). The Court therefore grants EMC's motion to strike
Plaintiff's request for punitive damages with respect to her . . . TILA claims.).

Fifth, punitive damages under Minn. Stat. § 549.20 are not allowed for unjust
enrichment claims. This is because, with exceptions inapplicable here, Minnesota law
allows punitive damages only where actual damages are present, whereas unjust
enrichment liability is concerned with the defendant's enrichment, not the plaintiff's actual
damages.

"Generally . . . outside a defamation context, punitive damages are permitted only
when actual or compensatory damages are also present." *Kohler v. Fletcher*, 442 N.W.2d
169, 173 (Minn. Ct. App. 1989) (citing *Jacobs v. Farmland Mut. Ins. Co.*, 377 N.W.2d
441, 446 (Minn. 1985)); *see also Potter v. La Salle Court Sports & Health Club*, 384
N.W.2d 873, 876 (Minn. 1986) (permitting punitive damages without proof of actual
damages in narrow context of civil rights discrimination). "The purpose of the actual
damages requirement is driven by the reluctance of courts to permit private parties to bring
actions solely for the purpose of levying private fines." *Aviva Sports v. Fingerhut Direct
Mktg.*, No. 09-1091 (JNE/JSM), 2010 U.S. Dist. LEXIS 145614, at *28 (D. Minn. Oct. 7,
2010) (citing *Jacobs*, 377 N.W.2d at 445).

Under Minnesota law, however, actual damages are not an available remedy for an unjust enrichment claim. In such cases, the plaintiff's recovery generally is "based upon what the person enriched has received rather than what the opposing party has lost." *Anderson v. De Lisle*, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984) (citation omitted); *In re Petition for Distribution of Attorney's Fees*, 870 N.W.2d 755, 759 n.2 (Minn. 2015) (noting that a claim for "restitution for the value of a benefit conferred in the absence of a contract under a theory of unjust enrichment" is a "claim in equity"). In contrast, actual damages are a legal remedy measured by reference to the amount the plaintiff lost from the defendant's wrongdoing. *See Poehler v. Cincinnati Ins. Co.*, 899 N.W.2d 135, 141 (Minn. 2017) ("[W]e have defined 'actual damages' as 'an amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.'") (citation omitted).

Thus, any amounts Plaintiff might recover under their unjust enrichment claim would constitute an equitable award consisting of any unjust benefit to Wells Fargo, rather than a legal award of actual damages. Accordingly, Plaintiffs cannot recover punitive damages for their unjust enrichment claim.

Additionally, the FAC fails to allege facts sufficient to support a clear and convincing inference under § 549.20 that Wells Fargo acted with deliberate disregard for the rights or safety of others.

The Court should therefore dismiss Plaintiffs' request for punitive damages under Minn. Stat. § 549.20 with prejudice.

## **CONCLUSION**

Wells Fargo did not have a fiduciary duty to protect Mr. O'Keefe from his choices. Although Plaintiffs' original complaint contained a fiduciary duty claim, Plaintiffs dropped it from the FAC after seeing Wells Fargo' opposition in its original motion to dismiss. UCC Article 4A unquestionably imposes the responsibility for a wire transfer on the person who authorizes it. Sadly, Mr. O'Keefe made the choice to wire $98,000 to an individual in Bangkok. Wells Fargo is not responsible for bearing the consequences of his choice. The bank is not his insurer.

For the foregoing reasons, Wells Fargo respectfully requests that the Court dismiss Plaintiffs' First Amended Complaint with prejudice.

Dated: April 29, 2024                    BALLARD SPAHR LLP

                                        By: /s/ Richard T. Thomson
                                        Richard T. Thomson # 0109538
                                        2000 IDS Center
                                        80 South 8th Street
                                        Minneapolis, MN 55402
                                        (612) 371-3211
                                        ThomsonR@ballardspahr.com
                                        *Counsel for Defendant Wells Fargo Bank,*
                                        *National Association*